## HEMENWAY, INC., v. ROACH.

### No. 5500.

Court of Appeal of Louisiana. Second Circuit.

June 30, 1937.

Rehearing Denied June 30, 1937.

Foster, Hall, Barrett & Smith, of Shreveport, for appellant.

W. M. Pollock, of Mansfield, for appellee.

TALIAFERRO, Judge.

Plaintiff sold to defendant a milk-cooling unit, consisting of a Fairbanks-Morse three-horsepower engine, with pump and pulley, a Frigidaire compressor, a 24-can storage box, and accessory equipment. The sale was closed on October 28, 1935, by the execution of note and chattel mortgage. It was preceded by considerable discussion between defendant and plaintiff's salesman. A concomitant of the sale was the obligation on plaintiff's part to service the unit for one year without charge. The equipment was delivered and installed several days following the signing of the papers. The total of the note, including carrying charges is $1,023.32, payable in 35 monthly installments of $28.44 each; the first falling due December 15th. No part of the price has been paid. This suit to foreclose the mortgage via ordinaria was filed on May 25, 1936.

Defendant resists the suit and seeks to be absolved from liability on the note on several grounds, the substance of which is that the unit's operation did not fulfill the guaranties made by plaintiff's representative at the time of and prior to sale, and, inferentially, was useless for the purposes for which purchased. The specific defects in the unit parts and the guaranties made and breached are alleged to be as follows:

1. That the engine designed to furnish the motor power necessary to function the compressor was of inadequate horsepower.

2. That defendant was promised a solid steel storage box, built in the city of Dallas, Tex., but an inferior one with wooden bot-

tom, built in the city of Shreveport, was imposed upon him; that it had no drain and developed leaks soon after installation.

3. That plaintiff's representative guaranteed that the unit would cool milk in quantities of 200 to 225 gallons in 40 minutes, whereas it requires from three to four hours to do so.

4. That at the time the sale was closed, he was promised that an aeriator would be furnished and installed free of cost to him, which was not done.

He avers that he is not an expert on milk-cooling machinery and relied upon the representations and guaranties of plaintiff's salesman regarding the ability of said unit to fulfill the purposes for which purchased; that after being installed, it did not give the service expected or guaranteed; that it was wholly incapable of cooling milk to the degree necessary to preserve it for market; and for all these reasons and causes, he pleads that he should be relieved from any obligation on the note and mortgage. He tendered return of the entire unit in his answer.

Defendant prevailed in the lower court and plaintiff brings this appeal. Defendant moves us to dismiss the appeal.

It is set up in this motion that no verbal motion for appeal was made in open court, but, on the contrary, the appeal was asked for and granted upon a written application wherein it was not prayed that appellee be cited and that no such citation in fact issued. The motion to dismiss does not declare that the written motion for the appeal was not presented in open court or that the order of appeal was not signed while the court was open. However, it is so stated in appellee's brief. Appellant's counsel take issue with this statement and attach to their brief a letter from the clerk of the lower court advising of the rendition of judgment in the case and that the court would again open on March 8th at 9:30 a. m. The minute entry of this date indicates that the court was open. It reads:

"Motion for appeal filed by counsel for plaintiff and order signed."

■ If the court was then in session and the written petition for the appeal was then and there presented and the order signed, this is sufficient. The right of appeal is an important one. It should not be denied except for good cause. Doubts are and should be resolved in favor of maintaining an appeal.

■ We do not think the motion to dismiss well founded. It is denied.

The case of Frankel v. Morse Timber Company, 140 La. 448, 73 So. 263, is directly in point.

Defendant's home is in the north end of De Soto parish, a short hour's drive by truck to the city of Shreveport. He owns and operates a farm and maintains thereon a herd of dairy cattle. The milk from these cows is sold daily to creameries in Shreveport. Prior to the purchase of the cooling unit, ice was exclusively used to reduce the milk's temperature to the degree necessary to meet inspection tests after being trucked to the creamery. From 250 pounds to 600 pounds daily, dependent upon the season, were required to acquire and maintain the needed temperature. High-power electric current was not available to him. Prior and subsequent to the date of the sale to defendant, plaintiff, through its agents and salesmen, made special efforts to induce the dairymen in defendant's section of the country, situated as was he, to purchase and install milk-cooling units of the same character as he purchased. Half a dozen or more sales were made. The advantages of the successful operation of such machinery are obvious. The item of operating expense is of the first importance, second to which was the elimination of the indispensable inconvenience and trouble attending daily buying, hauling, and handling of ice. Influenced by these considerations, defendant's wife and two sons, who really conduct the dairy end of his business, induced defendant to become interested in purchasing the cooling unit. He was not very enthusiastic over the venture. He was assured by plaintiff's agent that this unit would reduce the temperature of 200 or 225 gallons of milk in 10-gallon cans in the cooling box to 38 degrees or about within 45 minutes, with a daily fuel cost of approximately one-third the amount he was paying for ice. He was also assured that a boy or negro man of ordinary intelligence could operate it. To be accepted at the creamery, milk must be of not more than 50 degrees Fahrenheit. This is required by the Board of Health. As a rule five degrees will be lost on the trip to the creamery. Therefore, the milk's temperature should not be above 45 degrees when it leaves the dairy. We

are convinced that for a goodly part of the time, perhaps half, this unit would not and did not cool the milk to this point. Frequently ice had to be put in the box to supplement the unit's refrigeration to sufficiently cool the milk to warrant carrying it to the creamery. We are also convinced that much difficulty was experienced in getting the engine to run, although defendant's sons have had some experience in operating motor vehicles. It goes without saying that for a milk-cooling plant to serve the purpose for which desired, it must be of as dependable character as the skill of man can produce. To meet the requirements of the health authorities, milk, after drawn from the cows, must be immediately cooled to the required degree and kept at that temperature until promptly delivered to the creamery. Any failure along this line marks the milk for rejection, followed by penalties to the producer. No one can afford to rely upon such a cooler if it should be out of commission for one-fourth, one-third, or half the time.

The testimony in this case is not unlike that in nearly all others of same character. It is quite conflicting on the main issues. Plaintiff's agents, three or four in number, all say that defendant at no time complained of the lack of cooling efficiency of the unit, but of minor defects therein. They say that each time they visited the unit it was either functioning properly or was doing so before they left it. On the other hand, defendant, his wife and two sons, stoutly testified that the cooling system gave plenty of trouble from its installation, the main two sources being difficulty in starting the engine and keeping it going and the insufficiency of refrigeration to reduce the milk's temperature to the required level, and that complaints were often made to plaintiff and its agents of these conditions. They say that it was continuously necessary to purchase and use ice to preserve the milk against conditions which would render it unmarketable. Disinterested neighbors corroborate their evidence on these points of the case. We are convinced the principal source of trouble was due to inadequate motor power. The motor's load was too heavy. This caused it to stop often. Inadequate refrigeration was the direct result. Defendant's cooling box was a large one. It measured 6x12 feet and accommodates 24 ten-gallon cans.

Defendant's experience is not without a parallel. Several of his neighbors purchased like units from plaintiff and testified in his behalf. We now briefly relate their experiences:

W. F. Williamson's system was smaller than defendant's. It gave him so much trouble that he abandoned its use entirely. He was sued on the purchase price note and resisted the demand on about the same grounds as does defendant herein. This court sustained him. Hemenway, Inc., v. Williamson, 173 So. 781. That case is a little stronger for the purchaser than the present one. There, the purchaser constantly called on the seller for promised service to the unit, without much, if any, success.

J. C. Williams purchased a unit in November, 1935, smaller than defendant's. This was the first one plaintiff installed in this section of the state. His engine is two horsepower and his box holds thirteen or fourteen ten-gallon cans. His box capacity is practically one-half as great as defendant's, but his engine has two-thirds the horsepower. He testified that with the aid of a fair mechanic, his unit gave very good service, although it was not easy to reduce the milk's temperature below 50 degrees.

Everett Johnson purchased a unit in April or May, 1936. The engine was three horsepower. He had trouble from the beginning and had to run the engine 24 hours each day to insure proper refrigeration. He exchanged the engine for one of five horsepower and thereafter had a minimum of trouble of any character. The operating expense of the larger engine is no more than the smaller one.

E. T. Fisher also purchased a cooling unit from plaintiff in the early part of 1936. His is a three horsepower engine also. It has given him an abundance of trouble. The pump was installed "backwards." This was corrected. He thinks these units are all right, if properly installed and operated by motors of adequate horsepower. When the engine fails to run, he buys ice to cool his milk. He testified:

"Q. You are still operating your cooling equipment now? A. Yes, I am strolling along.

"Q. You haven't turned it back, have you? A. I have been trying, but I can't get it back.

"Q. What is the reason you want to turn it back—are the payments too much? A. No, it is too much trouble. * * *"

Article 2520 of the Revised Civil Code reads as follows:

"Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice."

■■ Under this law and the many decisions applying it, the complained about article need not be wholly worthless or defective to warrant resolution of its sale. Its use may be so "inconvenient and imperfect" that the sale may be set aside. In the present case, the engine and compressor are of standard makes. The companies which manufacture them are among the largest and most responsible in the country, but this particular equipment as a whole is inadequate for defendant's purposes and, specifically, the motor must have been, in addition, defective. It is certain the unit did not function as was guaranteed; but, without the special guaranty, the sale is vulnerable to the charge that the unit was unfit for the purposes for which purchased. This is of the essence of the seller's warranty and is strictly enforced unless warranty is waived. A. Baldwin Sales Company v. Mitchell, 174 La. 1098, 1102, 142 So. 700, 702, and authorities therein cited. The buyer is not required to prove the exact cause which renders the purchased article incapable of functioning for the purposes ·intended. He is only required to prove the failure of it to do so. Especially is this true as regards complicated machinery. Crawford v. Abbott Automobile Company, 157 La. 59, 101 So. 871; McCarroll Lumber Company v. Patenotte, 162 La. 99; 110 So. 102.

In the Baldwin Sales Company Case, supra, touching this question, the court said:

"A sufficient defense to plaintiff's demand for the purchase price was that the equipment sold defendant and installed in his plant did not fulfill plaintiff's guaranty. Hence, the burden of showing that it did so comply was clearly upon plaintiff."

■■■ It is elemental that the purchaser, as soon as he discovers the defective condition of a purchased chattel, or knows that it is useless or nearly so for the purposes intended, should immediately notify the seller of his discoveries. Especially is this true of articles whose usefulness is rapidly impaired by proper use, or which are of a perishable nature. Continued use of the thing at times suggests satisfaction over its performances. In the instant case, we are convinced that defendant's sons really desired to have an efficient milk-cooling unit to aid them in their dairying business. Such units have proven so successful over the country generally that their merit is no longer a subject of debate. Having the unit on hand, their continued efforts to use it are readily explainable. Their course, for which defendant is responsible, in this respect, should have no material bearing upon the present contest.

The Baldwin Sales Company Case, supra, involved equipment of a milk-cooling plant. The defendant had tried to use it, with plaintiff's assistance, for 18 months, during which time, the opinion says, he had suffered "inconvenience, expense and loss of milk by the failure of the plant to properly function." The sale there attacked was dissolved and the defendant given judgment for the amounts he had paid to plaintiff on that account.

We do not think the cooling box delivered to defendant of the character promised him. It was not as well constructed as it should have been and as was necessary to withstand the use it was usually exposed to. Defendant was not promised an aeriator free of charge. Plaintiff did promise to install one at cost if defendant would furnish it. This was done.

For the reasons herein assigned, the judgment appealed from is affirmed.

HAMITER, Judge (dissenting).

The defendant purchased the equipment in question on October 28, 1935, and obtained delivery and installation of it November 13, 1935. The total consideration of the sale was $1,023.32. This entire amount was payable in monthly installments beginning December 15, 1935, of which thirty-five were for $28.44 each and one was for $27.92.

This suit for the enforced collection of defendant's obligation was instituted on May 25, 1936. No part of the purchase price has ever been paid, notwithstanding numerous demands therefor having been made.

According to my appreciation of the evidence in the record, defendant used the equipment continuously from the date of the installation until the filing of suit, a period of more than six months, and no complaint was made to plaintiff during that time regarding its failure to properly perform the work for which it was sold. Furthermore, he made no offer to return it.

On the contrary, defendant's milk products were daily transported to the city of Shreveport and no loss was sustained thereto because of insufficient cooling. The records of plaintiff reveal that defendant requested the repairing of a crank and pulley, which became broken, and the welding of the pump that had frozen during cold weather on account of defendant's failure to drain it. These were repairs such as all machinery requires at various times depending on circumstances, and were not made necessary by any inherent defect in the equipment. They were performed as requested, and without charge to defendant.

It is my opinion that defendant's use of the refrigeration unit for more than six months, without complaining of its failure to properly function and without offering to return it, precludes his rescinding the sale. Its operation for a time sufficient to afford a discovery of the asserted defective condition was permissible; but when this condition became apparent, a duty devolved upon him to inform the seller of the imperfections and to offer to restore the status quo.

When sued for the purchase price of certain root beer equipment, the defendant in the case of Goode-Cage Drug Co. v. Ives, 16 La.App. 383, 133 So. 813, 815, sought to rescind the sale on the ground that such property was not suitable for the purpose for which it was sold. In denying the relief requested, this court said:

"The defendant has not offered to restore the status quo, and could not have executed the offer if he had made it. He has used the equipment for a whole season and consumed a considerable portion of the root beer syrup purchased. We think the defendant justified in using the equipment and the goods for only such time as was necessary to discover the defect complained of, which, from the date of delivery, could not have reasonably exceeded two weeks. If he, after such time had elapsed, had pointed out the defects or vices of the equipment and offered to return the goods, we are of the opinion that he would be entitled to have the sale rescinded, provided the defects were of such nature as to render the articles unfit for the purpose for which they were purchased, but the continued use of the articles sold throughout the root beer drinking season bars him from such recovery.

" 'Where the article is one which must be used before its quality can be ascertained, this not being apparent from examination, it is the right of the buyer to make use of the property or such portion thereof as may be actually necessary to determine the quality, and such use does not affect the right to reject for failure to comply with the contract in that respect. On the other hand, if, after knowledge of the breach of warranty as to quality, the buyer continues to use and consume the goods received by him, but not in order to make a proper test as to quality, he waives his right to rescind and return the amount unconsumed.' R.C.L. vol. 24, Sales, § 575."

This minority opinion also finds support in the case of Sidney Machinery Tool Co. v. Blanchard, 186 La. 476, 172 So. 532.

The instant case may be differentiated from that of Hemenway, Inc. v. Williamson, 173 So. 781, recently decided by this court. The evidence in that litigation conclusively showed that the purchaser repeatedly complained of the defective equipment and that the seller was never able to cause it to function properly.

For the foregoing reasons, I am compelled to respectfully dissent from the majority opinion.